UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| FOREST SINEGAL, § § | |
| Plaintiff, § § | CIV NO. 3:07-cv-0141 |
| v. § § | |
| RYAN MARINE SERVICES, et al., § § | |
| Defendants. § | |

## MEMORANDUM AND ORDER

Pending before the Court is Defendant Maritech Resources, Inc.'s Motion for Summary Judgment. For the following reasons, Defendant's Motion, Doc. No. 61, is **GRANTED**.

I.  BACKGROUND

   A.   **Factual Background**[1]

Plaintiff was employed by Dynamic Industries, Inc. ("Dynamic") as a welder/rigger/fitter to perform work on the Maritech High Island A 560 stationary platform off the coast of Galveston in the Gulf of Mexico. Two members of the Dynamic crew, Plaintiff and his brother Jonathan, worked on the platform, but at night slept on a boat, the RMS Atlantis, operated by Ryan Marine Services, Inc. ("Ryan Marine"). On March 22, 2006, Plaintiff was changing out grating and handrails on the platform. Around 10:30 p.m., Plaintiff's supervisor told him it was time to leave the platform, and advised Plaintiff he was going to get the crane operator to transfer Plaintiff and his brother to a work boat, the RMS Atlantis, via Billy Pugh basket.[2] Gregg Williams, an employee of Baker/MO Services, Inc. ("Baker/MO") was operating the crane that transfers the basket from the platform to the boat. Plaintiff alleges that during the basket transfer from the platform to the boat, high winds

---

[1] The relationships between and among the different parties are set forth in the following subsection.
[2] A Billy Pugh basket is a rope basket hooked to a crane.

1

and rough conditions prevented Williams from controlling the basket, and caused the basket to strike the crew boat port stacks and hit the railing of the boat. Plaintiff claims that, as a result, he lost his footing and fell to the deck of the boat, suffering severe injuries to his neck, back, wrist, and knee.[3]

Plaintiff subsequently brought suit against Maritech, Ryan Marine, Baker/MO, Williams, and others. (Pl.'s Fourth Am. Compl., Doc. No. 56.) This Court has jurisdiction over the lawsuit in admiralty pursuant to 28 U.S.C. § 1333.

B.  **Relationship Between the Parties**

Maritech was the owner and operator of the platform. Maritech has a mineral lease with the federal government for production of petroleum at the platform.

Plaintiff's employer, Dynamic, contracted with Maritech to repair damage to the platform caused by Hurricane Rita. A Master Service Agreement between Dynamic and Maritech states that Dynamic was an independent contractor. (Doc. No. 61, Dynamic Master Serv. Agree., Sec. 6 ("Contractor shall be an independent contractor as to all Work. Company shall have no control or direction over Contractor or Contractor's employees . . . Company being only interested in the results obtained.").) Section 8 of the Dynamic Master Service Agreement, entitled "Safety," also provides:

> It is understood by the parties that Contractor is an independent contractor and Company has no responsibility or duty to supervise Contractor's safety and health programs relative to the work. Contractor covenants, warrants and represents that all work performed by it hereunder shall be performed in the safest manner possible, consistent within industry standards and in strict compliance with all applicable rules, regulations, statutes, policies, and procedures of each governmental authority having jurisdiction over the Work performed. Contractor and its employees, agents, and subcontractors shall abide fully with all applicable Company safety rules and regulations

---

[3] Parties dispute exactly how the accident occurred. Plaintiff also contends that Williams failed to warn him of any wind conditions and wave height and their potential effect on the crane operations. (Doc. No. 62, Ex. 2.)

2

(Doc. No. 61, Dynamic Master Serv. Agree, Sec. 8.)

Maritech also contracted with Defendant Baker/MO to provide operating services, including the provision of a crane operator. Baker/MO and Maritech also had a Master Service Agreement stating that Baker/MO was an independent contractor. (*See, e.g.*, Doc. No. 61, Ex. A, p. 19-23; Depo. Ex. 3; Baker/MO Master Serv. Agree, Sec. 6 ("Contractor shall be an independent contractor as to all work. Company shall have no control or direction over Contractor or Contractor's employees and its subcontractors and their employees. Company being only interested in the results obtained.").) Section 8 of the Agreement, entitled "Safety," provides:

> It is understood by the parties that Contractor is an independent contractor and Company has no responsibility or duty to supervise Contractor's safety and health programs relative to the work. Contractor covenants, warrants and represents that all work performed by it hereunder shall be performed in the safest manner possible, consistent within industry standards and in strict compliance with all applicable rules, regulations, statutes, policies, and procedures of each governmental authority having jurisdiction over the Work performed. Contractor and its employees, agents, and subcontractors shall abide fully with all applicable Company safety rules and regulations

(Doc. No. 61, Baker/MO Master Serv. Agree, Sec. 8.)[4] Gregg Williams, who was operating the crane at the time of the accident, was an employee of Baker/MO. Williams held the title of "lead operator." (Doc. No. 61, Ex. E at 16.)

Maritech also contracted with Offshore Oil Services (OOS) to subcharter the RMS Atlantis. Defendant Ryan Marine operated the crew boat that Plaintiff was attempting to board at the time of the accident.

## II.   SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the

---

[4] The Court will not consider the Baker-Maritech "Work Agreement" submitted by Defendant as Exhibit B to its Motion for Summary Judgment. As Plaintiff correctly points out, the Work Agreement was executed in July 2006, four months after the accident at issue in this case.

evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. *See, e.g., Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### III.  ANALYSIS

Defendant Maritech contends that it cannot be held liable as a property owner for personal injury to an independent contractor under Section 95 of the Texas Civil Practice and Remedies Code. Plaintiff contends that Section 95 does not apply to this case because Plaintiff was off premises when injured and completed work, and that even if Section 95 does apply, Maritech may be held liable for his injuries. Plaintiff also argues that Maritech is liable for Gregg William's actions based on a theory of non-delegable duty.

#### A.  Outer Continental Shelf Lands Act

Parties agree that the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331, applies to this case. Under OCSLA the law of the adjacent state—in this case, Texas—applies

4

unless state law is inconsistent with federal law or regulations. 43 U.S.C. § 1333. The Southern District of Texas has clarified that for adjacent state law to apply under OCSLA: "1) the controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto); (2) federal maritime law must not apply of its own force; and (3) the state law must not be inconsistent with federal law. *Franks v. Chevron Corp.*, No. 3:06-cv-506, 2007 WL 2330296, at *1 (S.D. Tex. Aug. 13, 2007) (citing *Union Tex. Petroleum Corp. v. PLT Eng'g*, 895 F.2d 1043, 1047 (5th Cir.1990)).

Here, parties do not dispute that the platform constitutes a situs covered by OCSLA. *See also Franks*, 2007 WL 2330296 at *3 ("[T]he situs rule will be satisfied if, at the time of the injury, the worker was in physical contact with the platform or some appurtenance thereto." (citing *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1527 (5th Cir. 1996).) Nor does either party contend that federal maritime law applies of its own force. Although Plaintiff discusses Occupational Safety and Health Standards (OSHA) and the Mineral Management Services (MMS) regulations at length in support of his non-delegable duty theory, he does not argue that Chapter 95 of the Texas Civil Remedies and Procedure Act is inconsistent with federal law. *See also Franks*, 2007 WL 2330296 at *4 (finding that Chapter 95 was not inconsistent with federal law).

B.   **Chapter 95 of the Texas Civil Practice and Remedies Code**

Prior to the passage of Chapter 95, Texas common law controlled premises liability claims brought by an injured independent contractor who was performing work for a premises owner or contractor. *See Arsement v. Spinnaker Exploration Co., LLC*, 400 F.3d 238, 244 (5th Cir. 2005). Under Texas common law, "[t]he general rule is that an owner . . . does not have a duty to see that an independent contractor performs work in a safe manner." *Redinger v. Living, Inc.*, 689 S.W.2d 415, 418 (Tex. 1985). A property owner or contractor "was liable [under Texas common law] for

5

negligent activity only if it controlled the independent contractor's methods of work *and* failed to take reasonable care for such control." *Id.* (emphasis in original) (citing *Redinger*, 689 S.W.2d at 418).

In 1996, the Texas legislature passed Chapter 95 of the Texas Civil Practice and Remedies Code as part of a broader "tort reform" effort. *See, e.g., Arsement*, 400 F.3d at 245; *Spears v. Crown Central Petroleum Corp.*, 133 Fed. Appx. 129, 130 (5th Cir. 2005) (unpublished). Chapter 95 "provide[s] greater protection for property owners" against negligent activity claims by independent contractors. *Arsement*, 400 F.3d at 245. Where Chapter 95 applies, a property owner is not liable for injuries to an independent contractor "who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace," unless:

> (1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and
> (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

TEX. CIV. PRAC. & REM. CODE § 95.003. Chapter 95 therefore codifies the holding in *Redinger* regarding control, but modifies the common law approach by protecting the property owner from liability unless it has *actual* knowledge of the dangerous activity resulting in the injury and fails to *adequately* warn of the danger. *Arsement*, 400 F.3d at 245; *see also Phillips v. The Dow Chemical Co.*, 186 S.W.3d 121, 132 (Tex. App.—Houston [1 Dist.] 2005).

### 1.  Chapter 95 Applies to Plaintiff's Claims

Plaintiff argues that Chapter 95 does not apply to his claim because he was injured when he was off the clock and off the Maritech premises.

Chapter 95 applies only to a claim:

> (1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor; and
> (2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.

TEX. CIV. PRAC. & REM. CODE § 95.002. The defendant bears the burden of showing that Chapter 95 applies to a plaintiff's claim. *See Jones v. Apache Corp.*, No. G-05-499, 2007 WL 656268, at *2 (S.D. Tex. Feb. 27, 2007). Chapter 95 applies to both premises defect claims and to negligent activity claims. *Arsement*, 400 F.3d at 249 (citing *Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 84 (Tex. App.—Houston [1st Dist.] 2003, no pet.). Although the Texas Supreme Court has not yet considered a Chapter 95 case, Texas Courts of Appeal have construed Chapter 95 broadly. *See Spears*, 133 Fed. Appx. at 131.

Despite the language of Section 95.002 requiring that the claim "arise[] from the condition or use of an improvement to real property," Texas courts have applied Chapter 95 even where the defective condition or activity leading to the injury was not the direct object of the independent contractor's work. In *Fisher v. Lee and Chang Partnership*, the Appeals Court noted that "[t]he statute does not require that the defective condition be the object of the contractor's work," and applied Chapter 95 where the appellant was injured while using a "ladder to reach the roof to perform his job, the repair of air conditioning units." 16 S.W.3d 198, 201 (Tex. App.—Houston [1 Dist.] 2000). The *Fisher* court additionally noted that the ladder "provided appellant a means to reach his work site. It was not the object of his work. Nevertheless, appellant's injuries arose from 'the failure to provide a safe workplace.'" 16 S.W. 3d at 202 (citing Tex. Civ. Prac. & Rem. Code §95.003). The *Fisher* court discussed the legislative history of Chapter 95, and concluded that the injury-producing defect must only "relate to" the contractor's work. *Id.* at 202. Likewise, in *Clark v. Ron Bassinger*, a Texas Court of Appeals applied Chapter 95 where an independent contractor

7

who was working on the room of a home fell through a skylight opening and was injured. No. 07-03-0291-CV, 2006 WL 229901, at *1 (Tex. App.—Amarillo Jan 31. 2006). The *Clark* court, citing *Fisher*, rejected the argument that Chapter 95 did not apply because Clark's injury was unrelated to his plumbing work:

> Clark was engaged in the construction of an improvement to real property. His duties required him to work on the roof. As in *Fisher*, although the covered skylight opening was not the object of Clark's work, it was an unsafe part of his workplace and his injury arose from the failure to provide him a safe workplace.

*Id.* at *2. Unlike the case before the Court, in both *Clark* and *Fisher*, however, the injured party was engaged in the performance of his work and was on the property owner's premises.

At least one federal District Court has held that Chapter 95 applies to a claim, even though the plaintiff was not on the property owner's premises at the time he was injured. In *Franks v. Chevron*, the plaintiff was providing maintenance on a platform. No. 3:06-cv-506, 2007 WL 2330296, at *1 (S.D. Tex. Aug. 13, 2007). The plaintiff was ordered to transfer to a vessel located alongside the platform to "rig up a container on the vessel in order to offload it to the platform." While on the adjacent vessel, plaintiff slipped while climbing off the container, and fell onto the deck, sustaining injuries. *Id.* The Southern District of Texas rejected plaintiff's argument that Chapter 95 did not apply to his claims against the platform owner because his injury was not sustained on the platform itself, and instead found that the vessel was "merely an extension of the premises." *Id.* at *6. The court explained:

> Accepting Plaintiff's argument that his claim is not a premises liability claim because he was injured on the Seacor vessel would require a hyper-technical application of the statute and would undermine the legislative intent of providing greater protection for property owners against independent contractor's negligence claims. Although the Plaintiff was "fortuitously positioned" on the vessel at the time of his accident, he was similar to all the other plaintiffs in cases applying Chapter 95 in that he was injured while in the course of modifying the improvement, that is adding a storage container to the platform. The nature of offshore drilling platforms, because of their size and location, make them ill-equipped for having on premises all

8

>the necessary equipment. Therefore, transportation vessels are necessary for transporting people and equipment back and forth from offshore platforms. For purposes of premises liability, the vessel was merely an extension of the premises. A premises which the Plaintiff was required, as a part of job duties, to perform work on.

*Id.* (internal citations omitted). Notably, however, the *Franks* court emphasized that the plaintiff was injured while he was actually performing work related to modification of the improvement. *Id.*

The Court is unaware of any Texas case applying Chapter 95 to an injury sustained where the plaintiff was no longer performing any work nor was located on the premises. *Spears v. Crown Central Petroleum*, an unpublished Fifth Circuit case, comes the closest to reaching such a conclusion. In *Spears*, the court found that Chapter 95 applied where an independent contractor tripped on steel-braided hoses lying across his path. *Spears*, 133 Fed. Appx. at 129, 131 (emphasizing that "the Texas intermediate courts of appeals have unanimously construed chapter 95 broadly")). The plaintiff tripped on the hoses after he had finished performing his work and was headed to a tool shed. *Id.* at 129. The tool shed presumably was located on the property owner's premises, however.

Although there is no precedential case directly on point, the Court finds that the application of Chapter 95 is appropriate in this case. Both the Southern District of Texas and the Fifth Circuit, albeit in non-precedential opinions, have emphasized the broad reading of Chapter 95 by the Texas appellate courts. Although Plaintiff was not working on the improvement at the time of his injury, the crane and Billy Pugh basket provided him with a "means to reach his worksite," as did the ladder in *Fisher*.[5] Such transportation, particularly in the context of offshore platform work, can be considered "related to" Plaintiff's work. *See Franks*, 2007 WL 2330296 at *6 (finding transportation vessel to be an extension of an offshore platform and discussing the special nature of

---

[5] Although the basket was being used in this instance to transport Sinegal from the worksite to his sleeping quarters, it was also used to transport him from the boat to the platform in the mornings.

offshore platform work). The *Spears* court has found that Chapter 95 may apply to an injury sustained shortly after a contractor concluded his work, and this Court likewise finds that Chapter 95 applies in this case even though Plaintiff was no longer on the clock. As the Court explains below, however, even if Chapter 95 did not apply, Plaintiff's claims would be barred under the common-law outlined under *Redinger*.

2.  **Plaintiff's Claims Are Barred by Chapter 95 and *Redinger***

In order for a property owner to be liable to an independent contractor, the property owner must: 1) exercise "some control over the manner in which the work is performed;" 2) have "actual knowledge of the danger or condition" resulting in the injury; and 3) fail to adequately warn. Tex. Civ. Prac. & Rem. Code § 95.003.

Maritech argues that it may not be held liable under Chapter 95 because it had no contractual right to control nor did it exercise actual control over the operation of the crane and personnel basket. Plaintiff argues that there is at least a genuine issue of material fact as to whether Maritech controlled the personnel basket transfer.[6]

In *Redinger*, the Texas Supreme Court adopted the Second Restatement approach to determining whether a property owner owes a duty to an independent contractor. 689 S.W.2d at 418. Several Texas appellate courts have acknowledged that Section 95.003(1), regarding control, is simply a codification of this holding in *Redinger*. See, e.g., *Phillips v. The Dow Chemical Co.*, 186 S.W.3d 121, 132 (Tex. App.—Houston [1 Dist.] 2005).

A property owner "can retain the right to control an aspect of an independent contractor's work so as to give rise to a duty of care to that independent contractor's employees in two ways: by

---

[6] This case involves two independent contractors—Dynamic (and its employee Sinegal) and Baker (and its employee Williams). Texas courts have clarified that the question of control must focus on the owner's control over the injury-producing activity itself. In this case, the injury producing activity was the transfer, by Billy Pugh basket, from the platform to the boat. Defendant's control over that activity, therefore, appears to be the relevant inquiry.

contract or by actual exercise of control." *Lee Lewis Const., Inc. v. Harrison*, 70 S.W.3d 778, 783 (Tex. 2001). The question of whether a contract gives a right of control is generally a question for the court, while the question of actual control is "generally a question of fact for the jury." *Id.*

In order for such a duty to arise, the property owner's "right of control must not merely be general or supervisory but must extend to the 'operative detail' of the contractor's work so that the contractor is not free to do the work in its own way, and to the injury-producing activity itself." *Id.* at 792. "The right to control must be more than a general right to order work to stop and start, or to inspect progress." *Coastal Marine Service of Texas, Inc. v. Lawrence*, 988 S.W.2d 223 (Tex. 1999); *see also* Tex. Civ. Prac. & Rem. Code § 95.003(1); *Redinger*, 698 S.W.2d at 418 (citing RESTATEMENT (SECOND) OF TORTS § 414, cmt. c). The Texas Supreme Court further clarified in *Dow Chemical v. Bright*:

> For a general contractor to be liable for its independent contractor's acts, it must have the right to control the means, methods, or details of the independent contractor's work. Further, the control must relate to the injury the negligence causes, and the contract must grant the contractor at least the power to direct the order in which work is to be done.

89 S.W.3d 602, 607 (Tex. 2002); *see also Arsement* 400 F.3d at 252.

In this case, the relevant contracts provide Maritech with no right to control its independent contractors' work. The Court's inquiry is therefore specifically directed to whether Maritech actually controlled the injury-producing activity, i.e., the transfer of Plaintiff via Billy Pugh basket to the RMS Atlantis.

Defendant argues that Maritech exercised no actual control over the basket transfer. It is undisputed that Gregg Williams, a Baker/MO employee, was operating the crane that transferred Plaintiff from the platform to the *RMS Atlantis*. The parties also concede there were no Maritech personnel on the platform at the time of the accident. Nor is there any argument that Maritech in

any other way controlled Plaintiff's entry and exit from the platform, or that Maritech controlled the manner in which Plaintiff himself conducted his work. Plaintiff admits that he took his job directions and instructions from Dynamic supervisors or occasionally the Baker/MO lead operator. Plaintiff's own supervisor instructed him it was time to leave for the day and went to get the Baker/MO crane operator to make the crane transfer.[7]

Williams testified that, as lead operator, he was "responsible for the production, maintaining the maintenance, and the compliance, the logistics" and "everything that goes on on the platform." (Doc. No. 61, Ex. E.) Williams had been trained on how to operate the crane during a personnel basket transfer, but there is no allegation that this training was provided by Maritech. (*Id.*) Williams was paid by Baker/MO and Baker/MO provided him with a written job description setting forth his duties and responsibilities as lead operator. (*Id.*)

According to Plaintiff, Maritech is required to designate a "person in charge" at each facility under the relevant MMS regulations. As "lead operator," Williams was the "person in charge" of the Platform. Russell Steiner, the Maritech safety and compliance superintendent, testified that Maritech delegated safety of the workplace to Baker/MO through Williams, the lead operator. (Doc. No. 62, Ex. 18, at 56-57.) Williams was responsible for providing a Maritech safety orientation to all new employees and subcontrators before entering a work area. (*Id.* at 86-87.) David Boudreaux, Maritech's production manager and corporate representative, testified that Maritech requires all contractors to abide by Maritech safety rules and regulations. (Doc. No. 62, Ex. 12, at 22-23; *see also* Herron Depo, Doc. No. 62, Ex.13 at 18, 20 (testifying that Baker/MO's safety program on the platform was in accordance with Maritech policies and adding that he and his crew were the "eyes and ears of Maritech" on the platform.) Plaintiff also notes that Maritech

---

[7] Defendant argues that the decision to make the personnel basket transfer was a joint decision between Williams, the *RMS Atlantis* captain, and Plaintiff. Plaintiff has made no argument that Maritech controlled the captain's work.

safety rules and regulations were present on the platform along with a platform orientation sheet informing contractors what they may and may not do and alerting them to any hazards. (Doc. No. 62, Ex. 18, at 80-81; *see also* Doc. No. 62, Ex. 12, at 35.) The contractors initial and sign the orientation sheet. (*Id.*) Williams also filled out an accident investigation on a Maritech form. (*Id.* at 75-76; Doc. No. 62, Ex. 19; *see also* Williams Depo., Doc. No. 62, Ex. 14, at 28-29.)

None of Maritech's safety procedures specifically proscribe the manner in which personnel basket transfers are to be made or the weather conditions that would warrant cancellation of a transfer. (See Doc. No. 61, Ex. A, 44-45.) Plaintiff emphasizes, however, that Maritech was aware of several accidents involving crane and personnel basket transfers, and had issued a Maritech Safety Alert to persons in the offshore field about this problem. (Doc. No. 62, Ex. 18, at 105-06; 112-14; Doc. No. 62, Ex. 21.)

Plaintiff additionally provides some evidence as to Maritech's control over Williams' activities in areas unrelated to safety. Plaintiff points out, for example, that Williams did production reports on Maritech forms. (Doc. No. 62, Ex. 14, 17-18.) Plaintiff additionally points out that Williams approved and signed time tickets of subcontractor Dynamic. (*Id.* at 58-60; Doc. No. 62, Ex. 24.) Williams did testify that he had daily, weekly, and monthly assignments that came from Baker/MO and Maritech. (Doc. No. 61, Ex. E, 114.) Williams also testified that Maritech did not ever direct him on the method and manner of doing personnel basket transfers. (*Id.* at 117.)

Plaintiff's evidence that Maritech required its independent contractors to comply with Maritech safety regulations is not sufficient to establish the kind of control required by Section 95.003. "Merely exercising or retaining a general right to recommend a safe manner for the independent contractor's employees to perform their work is not enough to subject a premises owner to liability." *Koch Ref. Co. v. Chapa*, 11 S.W.3d 153, 155 (Tex. 1999); *Arsement*, 400 F.3d

13

at 252 (citing *Dow*, 89 S.W. at 607). If a premises owner's control is limited to requiring a subcontractor to comply with the owner's safety regulations, the owner owes the subcontractor's employees only a "narrow duty of care that its safety requirements and procedures do not unreasonably increase the probability and severity of injury." *Dow*, 89 S.W. 3d 607 (citing *Hoechst-Celanese Corp. v. Mendez*, 967 S.W.2d 354, 358 (Tex. 1998). The narrow duty that arises from requiring a subcontractor to follow an owner's safety regulations has been interpreted to encompass only "a duty that any safety requirements and procedures [the owner] promulgated did not unreasonably increase, rather than decrease, the probability and severity of injury." *Hoechst-Celanese Corp.*, 967 S.W.2d at 358; *see also Koch*, 11 S.W. 3d at 156 (finding that the presence of an owner's safety representative and the owner's prior instructions to a contractor's employees to perform their work in a safe manner did not constitute the kind of control needed to create a duty); *Dow*, 89 S.W. 3d 608. There is absolutely no evidence in this case that Maritech's general safety requirements and procedures increased the probability and severity of Plaintiff's injury. While Maritech did not have specific safety regulations regarding personnel basket transfers, the Maritech Safety Alert issued February 20, 2006 did outline measures to prevent problems with personnel basket transfers. (Doc. No. 62, Ex. 21.) Plaintiff does not argue, however, that these measures increased the probability or severity of Plaintiff's injury. Indeed, nothing in the measures would appear to do so.

Any other control that Maritech may have exercised over Williams' in terms of production reports or time records appears entirely unrelated to the work that produced plaintiff's injury. Thus, this kind of control would not impose a duty on Maritech under Section 95.003.

Plaintiff relies on the Southern District of Texas' holding in *Franks v. Chevron Corp.* in support of its argument that these facts are sufficient to create a genuine issue of material fact as to

whether Maritech exercised the requisite control over the work that produced the alleged injury. No. 3:06-cv-506, 2007 WL 2330296 (S.D. Tex. Aug. 13, 2007). In *Franks*, however, there was evidence that the premises owner had directly, and allegedly negligently, instructed the plaintiff to perform the activity that led to his injury. *Id.* at *1, *7. No such evidence is present in this case.

The Court finds, therefore, that there is no genuine issue of material fact as to Maritech's control over the relevant work. As a result, Plaintiff's claim against Defendant is barred under Section 95.003. Because Plaintiff has failed to establish that Maritech exercised the requisite control over this work, the Court need not reach the question of whether Maritech had actual knowledge of the danger or failed to adequately warn Plaintiff.[8]

Furthermore, because the "control" section of 95.003 codifies the common law requirement set forth in *Redinger*, Plaintiff's claims against Maritech would fail even if Chapter 95 did not apply in this case.

### C. Non-Delegable Duty and Vice-Principal

Plaintiff also argues that Maritech is liable for the actions of Williams because Maritech's duties under the Occupational Safety and Health Standards (OSHA) and the Mineral Management Services (MMS) regulations are non-delegable and because Williams was Maritech's vice-principal.[9]

The Fifth Circuit has already rejected the argument that MMS regulations impose an independent duty on a platform owner to maintain a safe workplace. *See, e.g., Fruge Ex. Rel Fruge v. Parker Drilling Co.*, 337 F.3d 558, 561-64 (5th Cir. 2003) (noting that the MMS regulations

---

[8] The parties do not appear to dispute that Plaintiff was not adequately warned about the danger or that there is at least a genuine issue of material fact as to this question.
[9] Plaintiff does not clarify whether he believes that the alleged non-delegable nature of this duty renders Chapter 95 inapplicable or whether he believes that such liability can be imposed even if Chapter 95 would prevent such liability. The Court presumes that Plaintiff intends to argue that the non-delegable duty renders Chapter 95 inapplicable, given that the Texas courts have found Chapter 95 to be an exclusive remedy. *See Francis v. Coastal Oil & Gas Corp.*, 130 S.W.3d 76, 88 (Tex. App.—Houston [1 Dist.] 2003) (finding that Chapter 95 is an exclusive remedy and precludes common law negligence liability).

15

"govern the parties' joint and several liabilities vis-à-vis the Government, not amongst themselves); *Dupre v. Chevron U.S.A., Inc.*, 109 F.3d 230, 231 (5th Cir. 1997). The Fifth Circuit and other courts have further determined that OSHA does not create a private right of action, and thus does not impose any duty on an employer. *See, e.g., Jeter v. St. Regis Paper Co.*, 507 F.2d 973, 976-77 (5th Cir. 1975) ("[N]o cause of action for such violations can be implied under OSHA to run in favor of a person who was not an employee of the violator against whom recovery is sought."). The Texas Courts of Appeals have also rejected the argument that OSHA regulations impose such a non-delegable duty on a premises owner, and have held that common law duties are not expanded by OSHA. *See, e.g., McClure v. Denham*, 162 S.W.3d 346, 352-54 (Tex. App.—Fort Worth 2005).

Plaintiff's reliance on *Denson v. Diamond Offshore Co.* is unavailing. 955 So.2d 730, 735, (La. App. 4 Cir. 2007). In *Denson*, the Court noted that although *Fruge* held that no cause of action existed under MMS regulations, it "recognized the operational control exception based on Louisiana negligence law as espoused in *Coulter*." *Id.* The *Denson* court then concluded that a fact issue existed as to whether a lease operator maintained operational control over an independent contractor's relevant acts. *Id.* The *Denson* court was clearly analyzing the relevant question of control, and not a question of non-delegable duty. To the extent that *Denson* reached a different conclusion than this Court on the question of control, the Court finds that the facts in *Denson* differed from those in the present case. The Court further observes that the *Denson* court was applying Louisiana law regarding any duty that might arises from a property owner or general contractor's requirement that an independent contractor comply with its safety regulations.

The Court finds, therefore, that Maritech did not owe Plaintiff a non-delegable duty to ensure his safety pursuant to the relevant MMR or OSHA regulations, and thus does not reach the question of whether Williams can be considered Maritech's Vice-Principal.

## IV. CONCLUSION

Defendant Maritech's Motion for Summary Judgment, Docket No. 61, is **GRANTED.** Plaintiff's claims against Defendant Maritech are **DISMISSED WITH PREJUDICE.** The Court does not, of course, wish to be understood as expressing any opinion as to Plaintiff's claims against other Defendants.

**IT IS SO ORDERED.**

**SIGNED** this 8th day of September, 2008.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE